IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

BRIAN E. BETTS,

                              Petitioner,

          Vs.                                    No. 11-3097-SAC

DAVID MCKUNE, et al.,

                              Respondents.

MEMORANDUM AND ORDER

          This matter comes before the court on a petition for writ of habeas

corpus filed pursuant to 28 U.S.C. § 2254 (Dk. 1). The petitioner, Brian Betts,

is incarcerated in Lansing Correctional Facility serving a life sentence on a

premeditated first-degree murder conviction. Betts summarily addresses

numerous grounds for relief in his initial petition. The court will group the

different issues and arguments as follows: (1) Denial of due process from not

being granted a new trial following Carter Betts's recantation after trial; (2)

Denial of due process and prosecutorial misconduct in the presentation and

failure to correct the false testimony of Officer Thompson, Jimmy Spencer and

Carter Betts; (3) Denial of due process and violation of Confrontation Clause in

admitting Carter's testimony on Celester McKinney's statement pursuant to

the adoptive admissions exception; (4) Prosecutorial Misconduct due to

improper closing argument; (5) Denial of due process in the trial court's failure

to grant a continuance to investigate exculpatory evidence; (6) Denial of right to be present on five of eight times that the trial court answered the jury's questions during deliberation; (7) Ineffective assistance of trial counsel, Mark Sachse; (8) Constitutional error in overruling *Batson* objection; (9) Ineffective assistance of appellate counsel; (10) Error in withholding exculpatory evidence of Spencer's conviction and incarceration when testifying at trial; and (11) Cumulative trial error.

In response to the court's show cause order (Dk. 2), the respondents filed their answer and return (Dk. 15) and forwarded for the court's review the relevant state court records (Dk. 16). Counsel then entered an appearance on behalf of petitioner and filed the reply and traverse. (Dks. 27 and 28).

**PROCEDURAL HISTORY**

Following a jury trial in the District Court of Wyandotte County, the petitioner, Brian Betts, was convicted of the first-degree premeditated murder of Greg Miller. Betts filed two *pro se* post-trial motions that included allegations of ineffective assistance of trial counsel who was then allowed to withdraw. Betts retained counsel to represent him on these motions and a motion for judgment of acquittal. The trial court held evidentiary hearings before denying the motions and then sentencing the defendant to life imprisonment.

On direct appeal to the Kansas Supreme Court, petitioner raised numerous arguments including multiple claims of constitutional violations. His conviction was affirmed. *State v. Betts*, 272 Kan. 369, 33 P.3d 575 (2001). On August 19, 2002, the petitioner filed *pro se* a motion for relief under K.S.A. 60-1507 in Wyandotte County District Court. Counsel was appointed and an amended petition was filed with a supporting memorandum of law. The State moved to dismiss arguing that the issues were raised or should have been raised in the direct appeal. The district court, with the parties' agreement, articulated the "eight issues collectively raised in Betts' motions." *Betts v. State*, 225 P.3d 1211, 2010 WL 919795 at *1 (Kan. App. 2010). The district court then dismissed all issues but ineffective assistance of trial counsel and ineffective assistance of appellate counsel. The district court later denied the claims of ineffective assistance of trial counsel as either raised and denied on direct appeal or should have been raised on direct appeal. The district court addressed the merits of the ineffective assistance of appellate counsel claim and denied relief. The Kansas Court of Appeals affirmed the district court's denial of § 1507 relief. *Id*. The Kansas Supreme Court denied review. Petitioner then filed this pending petition for habeas corpus relief pursuant to 28 U.S.C. § 2254.

## FACTS

The court is to presume the state court's factual determinations are correct, unless the petitioner rebuts the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The petitioner has not carried that burden nor proffered any evidence in support of that burden. Thus, the court adopts the following facts as taken from the Kansas Supreme Court's opinion affirming his conviction:

Brian Betts, Celester McKinney, and Celester's brother, Dwayne McKinney, were all charged with the first-degree premeditated murder of Greg Miller. Based upon a pretrial motion to sever, the defendant and the McKinney brothers were granted separate trials. Defendant Betts was found guilty, and we deal with his appeal in this case. Celester McKinney was also found guilty, and on appeal his conviction was affirmed by this court in *State v. McKinney*, 33 P.3d 234 (Kan. 2001) filed this date. Dwayne McKinney was found not guilty.

The major players involved in this appeal are Brian Betts and Celester and Dwayne McKinney. The main witness for the prosecution was Carter Betts, who is the uncle of the three codefendants. Jimmy Spencer, Jr., uncle of the victim, also testified on the part of the State. Other witnesses who testified at trial are identified below.

In the early morning hours of December 29, 1997, police in Kansas City, Kansas, responded to a report of shots fired and found Greg Miller's body. Greg had been shot 18 times with both a shotgun and a rifle. A trail of blood ran to the body. Spent 12–gauge shotgun shells and empty rifle shell casings were found near the body.

Alfred Burdette, Jr., the person who reported the shots, testified he heard the gunshots at approximately 3 a.m. He looked outside and saw a person walking and firing a gun. Another person on the other side of the street was also firing. At first, Burdette thought the persons were shooting at each other, but then he noticed they both ran off together in the same direction. Burdette testified at trial that he saw one of the shooters enter the rear gate at 2917 N. 5th. The person went to the door, hesitated, and then went in. Officer Keto Thompson was one of the responding officers. Officer Thompson testified that he talked to Burdette. According to Officer Thompson, Burdette said the person went

4

between the houses, but Burdette did not know whether the person had actually entered the house in question.

Brian Betts resided at 2119 N. 5th with his uncle, Carter Betts. The defendant lived in an apartment at the residence with a separate entrance, while Carter, Celester McKinney, and Dwayne McKinney lived in the main part of the house.

Carter provided the testimony linking the defendant to the crime. Celester and Dwayne were cleaning a building on the night in question and returned home between 11:30 p.m. and midnight. Carter went to sleep but was awakened at approximately 3 a.m. by gunshots. He testified he then heard the front door open and close. He went downstairs to investigate and found the defendant, Dwayne, and Celester. A pistol grip shotgun and an assault rifle lay at the feet of Dwayne and the defendant.

According to Carter, he asked what happened and Celester replied that they "shot that Greg cat." Carter stated that Celester did most of the explaining, although the defendant and Dwayne also interjected comments. Celester explained to Carter that they suspected Greg, the victim, broke into and burglarized the defendant's apartment. Celester stated the defendant and Dwayne were looking for Greg but could not find him, so Celester went to his house to urge him to come out. When Greg denied having broken into the defendant's apartment, Dwayne raised a gun to shoot him. However, the gun jammed and Greg began to run away. Celester told Dwayne and the defendant to stop him because they could not let him live to be a witness. Dwayne and the defendant began firing and their shots knocked Greg down. Celester told Carter that the defendant then went over and finished Greg off. According to Carter, the defendant also confirmed that he stood over Greg and shot him. Carter testified the defendant later told him they had gotten rid of the guns.

Carter testified that when the police questioned him regarding the incident, he told them his nephews had been in bed asleep at the time the shots were fired. Later, however, the police questioned him at the station and he changed his story. Carter stated that his family was split over his testifying against his nephews. Near the end of the testimony, he began to cry. Under cross-examination, Carter testified that he and the defendant had a disagreement because the defendant thought Celester had broken into his apartment and Carter was protecting Celester by telling the defendant that Celester was with him when the break-in occurred. However, according to Carter, the defendant and he had resolved their differences by the time of the shooting.

Jimmy Spencer, Jr., Greg Miller's uncle, also provided information linking the defendant to the crime. Spencer stated that he woke up around 3 a.m. in order to get something to eat, and found that the soda pop that he had put in the refrigerator was gone. He woke Greg, who was living with him, and asked him if he had taken the soda pop. Greg confirmed that he had. Spencer sent Greg out to buy a soda pop from a nearby machine. When Greg returned, he told Spencer that a person named Les wanted to talk to him. Spencer testified he thought Greg was referring to the defendant as Les. Greg left to find out what Les wanted. Spencer stated he heard gunshots a few minutes later. He looked out the window and saw someone shooting toward the ground. Spencer dressed and went to investigate whereupon he found Greg's body. Soon after, the police arrived.

The other evidence linking the Betts' household to the crime came from a member of Greg's family who told police that a person named Les was involved.

The defendant presented an alibi defense. He testified he was asleep in bed with his fiancee and baby son when he heard the shots. The defendant stated he and Carter had many disputes over many things, including the break-in at his apartment, and that he did not associate with Carter, Celester, or Dwayne. The defendant also presented the testimony of his fiancee, who indicated the defendant was in bed when the shooting occurred, and that of his mother, who testified the defendant and Carter had quarreled over the defendant's pay from Carter's cleaning business.

The jury convicted the defendant of premeditated first-degree murder on August 21, 1998. The defendant filed a motion for new trial, arguing that Carter had recanted his trial testimony. The motion also alleged 11 other grounds for a new trial including: (1) the State had violated his constitutional rights by suborning the perjury of Officer Keto Thompson, Spencer, and Carter; (2) the State had failed to provide the defendant with exculpatory evidence including Carter's retraction and Spencer's criminal record; (3) the court erred in severing the trials of the codefendants; (4) the court had erroneously denied the defendant's Batson objection; (5) the court had erred in allowing Carter's hearsay testimony; (6) the prosecutor had committed misconduct in closing argument; (7) the court had not properly instructed the jury as to lesser included offenses; (8) the court had not properly read back testimony to the jury; (9) the court had not properly responded to questions asked by the jury; (10) the defendant was denied effective assistance of counsel; and (11) the verdict was contrary to the evidence and the law.

The district court held a hearing on the motion for a new trial. Carter testified his statement to police was untrue and he did not know anything about the murder of Greg because he was asleep when the shooting occurred. According to Carter, he made up the statements of his nephews because police told him they already knew Celester and Dwayne were involved, and that three persons were seen entering his house following the shooting. Carter thought the police were suspicious that he might be the third person. He also felt pressured by the community and the police. Carter testified that Detective Smith said he would be charged if he did not tell the police what he knew and Smith also informed him as to what guns were used.

Carter testified he later told the police that his statement was untrue but they insisted he testify. He stated that Prosecutor Dan Cahill met with him before the preliminary hearing and instructed him as to what his story should be, as well as what to say to avoid the hearsay rule. When he told Cahill he did not want to testify, Cahill threatened him with prosecution.

The testimony then moved to the defendant's allegation that he had received ineffective assistance of counsel from his trial attorney, Mark Sachse. Sergeant Charles Patrick testified jail records indicated Sachse had made two visits to the defendant between February and September of 1998, one for 15 minutes and another for 25 minutes. Again, the defendant's trial was in August 1998.

Della Betts, the defendant's aunt, stated she had planned to testify on the defendant's behalf at trial but Sachse told her she should not testify because she would be a bad witness due to a bad check issue. Della stated that she would have testified that Carter told her he had no idea about the shooting and that one of the witnesses, Alfred Burdette, was a drunk. Della testified that she discussed this testimony with Sachse.

Ellen Lenard, the defendant's mother, testified that she visited Sachse approximately six times. She told Sachse of possible witnesses including her own mother, Mary Mitchell; her sister, Norma Jean Meeks; and Della Betts. She stated she pressed Sachse to file a motion for discovery but he told her such a motion was not necessary. She also informed Sachse that Burdette was a drunk.

The defendant testified that he met with Sachse one time prior to his preliminary hearing when Sachse urged him to take a plea. Later, Sachse visited him prior to trial and told him that he did not file a motion for discovery because he did not want to make the district attorney mad. The defendant testified that Sachse visited him the week before trial when Sachse told him to make a list of witnesses he wanted to call.

The defendant stated he wanted Sachse to call his grandmother, Mary Mitchell, to testify regarding problems and lack of affiliation with Carter, Dwayne, and Celester. He wanted to call Della Betts, and also Norma Jean Meeks, who would testify that Carter told her he lied to the police. He wanted to call another aunt, Lori Betts, and also Jesse Brochovich, both of whom would have testified that Carter told her Celester and Dwayne were asleep at the time of the shooting. Further, he wanted to call Detective Golubskie, who is married to the victim's aunt, to testify that he, Golubskie, had leaked certain confidential information to the victim's family. Finally, he wanted to call Andrea Burdette, daughter of Alfred Burdette, to testify that her father was an alcoholic and did not witness the shooting. However, according to the defendant, Sachse stated he did not want anyone to testify on the defendant's behalf.

The defendant testified that he sent Sachse letters on several different occasions, but Sachse did not respond or accept his telephone calls. The defendant also claimed he was unable to talk to Sachse during trial and that Sachse did not prepare him to testify. Sachse never revealed the information in the police report to him, nor did Sachse explain what his theory of defense would be. He also asked Sachse to investigate the crime scene but Sachse did not do so.

Sachse testified concerning his representation of the defendant. Sachse stated that he had tried approximately 130 jury trials prior to that of the defendant, with the vast majority of those being criminal, including eight murder cases. Sachse noted that he had actually been appointed twice in this case. The first time he managed to get the case dismissed at preliminary hearing. After charges were refiled, the defendant's family hired an attorney, who withdrew prior to trial. Sachse was reappointed.

Sachse stated he met with the defendant three or four times prior to trial and also met several times with the defendant's mother and family members. He also went to the crime scene and after reviewing the scene, decided it was in the defendant's best interest that the crime scene not be fully explained to the jury. With regard to discovery, he stated he was able to review the prosecutor's entire file. Although the defendant's mother pushed him to file a discovery motion, he explained to her that a discovery motion was not necessary because the State's entire file was available to him and provided more information than would be available under a discovery motion. Sachse admitted he did not file any pretrial motions but stated he believed none were necessary. By the time he entered the case for the second time, the case had already been severed from those of the codefendants.

With regard to his trial strategy regarding the calling of witnesses, Sachse stated he felt the key to the defense was to discredit Carter's testimony. Although the family wanted him to call the defendant's grandmother, Mary Mitchell, he discovered she did not want to testify and that she believed Carter was telling the truth. Sachse stated he did not want to call Della Betts because she had a dispute with Carter resulting in criminal charges being filed against her and also had a conviction which involved her veracity. He testified he did not want to put the defendant's aunt, Patricia Betts, on the stand because there was a note in the file that one of her sons, Celester or Dwayne, had called her and admitted being involved in the murder. When asked about a person named Robert Law, Sachse testified that neither the defendant nor the family told him about Law and, further, that Law would not have been a good witness because he was facing capital murder charges at the time of trial.

Sachse stated he advised the defendant not to testify, although the defendant did so. He also put the defendant's fiancee on the stand at the defendant's insistence, although the defendant had written a letter to her with lyrics from a rap song talking about shooting someone for stealing.

Sachse testified that much of the evidence the defendant's mother wanted him to present would not have been helpful to the case. Because Sachse's theory denied the defendant's involvement and placed the blame on Celester and Dwayne, it was important that Alfred Burdette's testimony be considered credible, as Burdette saw two people, not three, shooting the victim.

Sachse admitted he did not give an opening statement at trial. However, he testified he often does not do so when there is a chance his witnesses will testify differently than he expects.

On cross-examination, Sachse was confronted with the log book which detailed only two visits to the defendant. Sachse stated that he disagreed with the log book, and noted that the keeping of the book by the sheriff's office was done inconsistently. Sachse testified that in his opinion, he communicated sufficiently with the defendant to put on a competent defense. He stated he fully explained his strategy to the defendant.

The trial court ultimately found Carter's recantation was not credible. With regard to the defendant's claim of ineffective assistance of counsel, the trial court held that Sachse's performance was not deficient and that most of the allegations related to trial strategy. The trial court rejected all other arguments of defendant and denied his motion for new trial.

272 Kan. at 373-379.

**AEDPA STANDARD OF REVIEW**

This matter is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 130 S. Ct. 1855, 1862 (2010) (citation and internal quotation marks omitted). Under AEDPA, where a state prisoner presents a claim in habeas corpus and the merits were addressed in the state courts, a federal court may grant relief only if it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to clearly established Federal law" when: (a) the state court "'applies a rule that contradicts the governing law set forth in [Supreme Court] cases'"; or (b) "'the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Maynard v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)), *cert. denied*, 549 U.S. 1285

(2007). A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct legal rule from Supreme Court case law, but unreasonably applies that rule to the facts. *Williams*, 529 U.S. at 407–08. Likewise, a state court unreasonably applies federal law when it either unreasonably extends, or refuses to extend, a legal principle from Supreme Court precedent where it should apply. *House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008), *cert. denied*, 555 U.S. 1187 (2009).

In reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does not sit as a super-state appellate court. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Rather than issuing whenever a state court errs or is incorrect in applying clearly established federal law, the writ is reserved for when the state court's application is "objectively unreasonable." *Renico v. Lett*, 130 S. Ct. at 1862. "This distinction creates a substantially higher threshold for obtaining relief than *de novo* review." *Id.* (internal quotation marks and citation omitted). "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard,* 468 F.3d at 671.

When factual issues are raised in the § 2254 proceeding, the habeas court shall not grant relief unless the state court decision "was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Pursuant to § 2254(e)(1), the habeas court must presume the state court's factual determinations are correct, and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.'" *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

## DENIAL OF NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE

As summarized above in the Kansas Supreme Court's opinion, Carter testified at the hearing on the motion for new trial that he gave a false statement to the police as he was asleep during the shooting and knew nothing about the murder of Greg. Carter said he fashioned his statement so that he would not be considered as the possible third suspect in the murder. Carter also attributed his going forward with the false statement to being pressured and threatened by police and the prosecutor. The Kansas Supreme Court affirmed the denial of the new trial motion on the following grounds:

> K.S.A. 22–3501 provides a court may grant a motion for a new trial based on the ground of newly discovered evidence. Two requirements must be met before a trial court will grant a defendant's motion for new trial based upon newly discovered evidence. First, the defendant must establish that the newly proffered evidence is indeed "new," in that it could not, with reasonable diligence, have been produced at trial. Second, the evidence must be of such materiality that there is a reasonable probability that the newly discovered evidence would produce a different result upon retrial. *State v. Moncla*, 269 Kan. 61, 64, 4 P.3d 618 (2000). The granting of a new trial is a matter within

the discretion of the trial court. *State v. Reed*, 256 Kan. 547, 560, 886 P.2d 854 (1994).

While the State argues that the recanted testimony of Carter was not newly discovered evidence primarily because the defendant knew Carter's trial testimony was false at the time given, it is clear that until Carter recanted his testimony after trial, the defendant could not have known about the recanted testimony. We conclude that the recanted testimony of Carter was newly discovered and could not, with reasonable diligence, have been produced at trial.

New trials on grounds of newly discovered evidence are not favored and such motions are to be viewed with caution. *State v. Thomas*, 257 Kan. 228, Syl. ¶ 2, 891 P.2d 417 (1995).

The standard applied by the trial court for granting a new trial based on recanted testimony is well established. Where a new trial is sought on the basis of recanting testimony of a prosecution witness, the weight to be given such testimony is for the trial court passing on the motion for a new trial to determine. The trial court is required to grant a new trial only when he or she is satisfied the recantation of the witness' testimony is true and material. Appellate review of an order denying a new trial is limited to whether the trial court abused its discretion. *See State v. Norman*, 232 Kan. 102, 109, 652 P.2d 683 (1982).

In this case, after a full hearing upon the defendant's motion for a new trial, the trial court determined that Carter's recantation was not credible. The record supports this determination and at the very least fails to support the conclusion that no reasonable person would agree with the trial court's decision. *Shepherd*, 232 Kan. at 619, 657 P.2d 1112. The defendant fails to establish an abuse of discretion and the trial court's denial of the defendant's motion for new trial stands.

*State v. Betts*, 272 Kan. at 380-381.

Federal habeas relief is not available on a claim of newly discovered evidence unless there is an independent constitutional violation in the underlying trial. *See Clayton v. Gibson*, 199 F.3d 1162, 1180 (10th Cir. 1999) (citing *Herrera v. Collins*, 506 U.S. 390, 400 (1993)), *cert. denied*, 531 U.S. 838 (2000). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the

Constitution—not to correct errors of fact." *Herrera*, 506 U.S. at 400 (citations omitted). Petitioner argues the denial of due process from the trial court's finding that Carter Betts' recantation was not credible. He does not argue, and there is nothing to show, that the trial court applied a rule that contradicts Supreme Court precedent or reached a result different from any factually indistinguishable precedent. The court understands the petitioner to limit his challenge to the trial court's decision being "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A habeas court is to presume the state district court's factual finding is correct and to assign the petitioner "the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Petitioner offers no evidence or arguments to show it was an unreasonable determination for the trial court to find that Carter's recantation was not credible. The trial judge explained his finding as based on having "observed" Carter's testimony "at least six times, maybe more." (R. XIV, 4-5). The trial judge explained his credibility finding as supported by what he had observed as Carter's demeanor as a trial witness and later as a witness during the motion for new trial proceedings, by what he had learned about the strained family dynamics and Carter's initial reluctance to testify against his nephew, by what he had observed in the different post-trial written retractions

from the defendant's family as being "consistent" with one another, and by what he had perceived as Carter deciding to come forward with his statement only after a co-defendant's mother came forward and implicated her son and the defendant in this crime. *Id*. at 5-7. For all these reasons, the trial court found that Carter's recantation was not credible and that Carter had testified truthfully at trial. *Id*. There is nothing in the record or in the petitioner's brief that shows this finding to be an unreasonable determination.

Nor has the petitioner shown the Kansas Supreme Court's decision on this issue to be constitutionally flawed in any respect. The court has no basis for believing that the Kansas Supreme Court was objectively unreasonable in concluding that "[t]he record supports this [trial court's] determination and at the very least fails to support the conclusion that no reasonable person would agree with the trial court's decision." 272 Kan. at 381. The state courts' decisions rest on factual findings that were reasonably determined and supported by the record and that have not been rebutted with clear and convincing evidence. The petitioner is not entitled to relief on this claim.

**Denial of Due Process and Prosecutorial Misconduct in the Presentation of the False Testimony of Carter Betts, Jimmy Spencer and Officer Thompson**

*Carter Betts*

On direct appeal, the petitioner claimed a violation of due process

from the prosecutor presenting the false testimony of Carter. The Kansas

Supreme Court properly analyzed this issue employing the two-factor test in

*Napue v. Illinois*, 360 U.S. 264, 269 (1959), and concluded that the record

showed no presentation of perjured testimony. The Court found "ample

evidentiary support" for the trial court's finding "that Carter's recantation was

not credible and that his trial testimony was credible." 272 Kan. at 381. The

petitioner offers nothing that challenges these decisions as an unreasonable

determination of the facts in the record or as an unreasonable application of

United States Supreme Court precedent.

### *Jimmy Spencer and Officer Thompson*

The State contends that the petitioner has procedurally defaulted

these claims on Spencer and Thompson. While petitioner raised them in the

state collateral review proceedings, the courts did not decide them on the

merits, because they were not raised in the petitioner's direct appeal. (R. XV,

26-27); *Betts v. State*, 225 P.3d 1211, 2010 WL 919795 at *1, *8-*9 (Kan.

App. 2010). "A federal habeas court will not review a claim rejected by a state

court if the decision of the state court rests on a state law ground that is

independent of the federal question and adequate to support the judgment."

*Walker v. Martin*, ---U.S.---, 131 S. Ct. 1120, 1127 (2011) (internal quotation

marks and citations omitted). Thus, the rule applicable here is that "federal

habeas relief will be unavailable when . . . the state judgment rests on

independent and adequate state procedural grounds." *Id*. A procedural ground

is adequate when it is "firmly established and regularly followed." *Id*. The

Kansas Supreme Court Rule 183(c) states, in part that:

> a proceeding under K.S.A. 60-1507 cannot ordinarily be used as a
> substitute for direct appeal involving mere trial errors or as a substitute
> for a second appeal. Mere trial errors are to be corrected by direct
> appeal, but trial errors affecting constitutional rights may be raised even
> though the error could have been raised on appeal, provided there were
> exceptional circumstances excusing the failure to appeal.

A qualifying exceptional circumstance under this rule is ineffective assistance

of counsel. *Rowland v. State*, 289 Kan. 1076, 1087, 219 P.2d 1212 (2009).

Petitioner did not prevail on any such argument in state court. "If a particular

claim was defaulted in state court on an independent and adequate state

procedural ground, we recognize the state courts' procedural bar ruling and do

not address the claim on the merits unless cause and prejudice or a

fundamental miscarriage of justice is shown." *Thacker v. Workman,* 678 F.3d

820, 835 (10th Cir. 2012) (internal quotation marks and citations omitted),

*cert. denied*, 133 S. Ct. 878 (2013). The petitioner here makes no effort to

show cause and prejudice or a fundamental miscarriage of justice. The court

agrees with the State's argument that the petitioner has defaulted this claim.

**Denial of Due Process and Confrontation Clause Violation from Use of
Adoptive Admissions Exception for Carter Betts' Hearsay Statements**

The trial court admitted Carter Betts' testimony on what Celester

McKinney said about the shooting in the petitioner's presence. (R. XVI, 22-30).

The trial court overruled petitioner's hearsay objection and found Carter Betts' testimony to be admissible under the adoptive admission exception in K.S.A. 60-460(h)(2). (R. VI, 127). The initial habeas petition argues constitutional error in that Carter has since recanted making his testimony unbelievable and making any adoptive admission finding erroneous. This argument is no more than a repackaged presentation of the earlier challenge to Carter Betts' testimony based also on the subsequent recantation. The court has already rejected that argument finding nothing in the record or in the petitioner's brief to show the trial court's finding on the recantation and the Kansas Supreme Court's decision sustaining it to be unreasonable determinations. The original petition offers no viable legal or factual argument on this claim.

Petitioner's traverse argues for the first time in this § 2254 proceeding that the Kansas Supreme Court's decision here on adoptive admissions being a "firmly rooted hearsay exception" is contradicted by "well-settled federal law." (Dk. 28, p. 9). It asks for a finding that the Kansas court's "decision violated clearly-established federal law." *Id.* at 10. This argument is not properly before the court:

> Although the issue is raised in his district-court traverse, such a pleading, like a reply brief, is not a proper vehicle to raise a new issue. *See Jackson v. Duckworth*, 112 F.3d 878, 880 (7th Cir.1997); *see also United States v. Harrell*, 642 F.3d 907, 918 (10th Cir.2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived."). Accordingly, we will not address the issue. *See Coppage v. McKune*, 534 F.3d 1279, 1282 (10th Cir.2008).

*United States v. Moya-Breton*, 439 Fed. Appx. 711, 715, 2011 WL 4448857 at
*3 (10th Cir. 2011), *cert. denied*, 132 S. Ct. 1775 (2012); *see Thompkins v.
McKune,* 433 Fed. Appx. 652, 660, 2011 WL 3555415, 6 (10th Cir. 2011)
("[A]rguments raised for the first time in a traverse are not properly presented
to the district court . . . ." (citations omitted)); *Decker v. Roberts*, 2013 WL
1074761 at *11 (D. Kan. 2013). Even if this argument had been properly
presented, it would have been rejected as devoid of merit. Federal law fully
sustains the Kansas Supreme Court's conclusion "that the hearsay exception
under K.S.A. 2000 Supp. 60-460(h)(2) for adoptive admissions, . . ., is a firmly
rooted hearsay exception." 272 Kan. at 369. The Federal Rule of Evidence
801(d)(2)(B) provides that a statement is "not hearsay" if it is offered against
a party and the statement is "one the party manifested that it adopted or
believed to be true." an adoption or belief in its truth." "Adoptive admissions
are a firmly-rooted exception to the hearsay rule." *French v. Lafler*, 2009 WL
799217 at *7 (E.D. Mich. 2009) (citing *Berrisford v. Wood*, 826 F.2d 747, 751
(8th Cir. 1987), *cert. denied*, 484 U.S. 1016 (1988); *United States v. Monks*,
774 F.2d 945, 952 (9th Cir. 1985)). Celester's statements to which Carter
testified are the petitioner's own statements, because the trial court found that
the petitioner adopted them. Thus, there is no hearsay, and there is no
Confrontation Clause problem. *United States v. Kehoe*, 310 F.3d 579, 591 (8th
Cir. 2002), *cert. denied*, 538 U.S. 1048 (2003). The petitioner's reading of the

plurality opinion in *Lilly v. Virginia*, 527 U.S. 116, 134 (1999) is misguided, because the opinion does not address the hearsay exception for adoptive admissions but for "accomplices' confessions that inculpate a criminal defendant." The petitioner is not entitled to relief on this claim.

**Prosecutorial Misconduct**

Petitioner contends his rights to due process and a fair trial were violated when the prosecutor in his closing argument attributed to the petitioner a statement never made in the petitioner's testimony. The Kansas Supreme Court applied the two-step process in evaluating claims of a prosecutor's improper closing arguments:

> First, the appellate court must determine whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. Second, the appellate court must determine whether the remarks constituted plain error; that is, whether they were so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial. In order to find that the remarks were not so gross or flagrant, the court must be able to find that when viewed in light of the record as a whole, the error had little, if any, likelihood of changing the result of the trial. *State v. McCorkendale*, 267 Kan. 263, 278–79, 979 P.2d 1239 (1999).
>
> . . . .
>
> During closing arguments, the prosecutor stated:
> "Think about Carter Betts, think about what he told you, think about whether the defendant's story made sense. Remember what he said. Family's family. I can tell my Uncle Carter about a murder and I expect him to cover for me. They attack Carter, is that surprising? It's the only thing they can do." (Emphasis added.)
>
> . . . .
>
> The defendant did not state he could tell Carter about a murder and expect Carter to cover for him. He implicitly stated he did not think Carter would cover for him if he committed a murder. However, a reading of the statement in context shows that the prosecutor was not

alleging the defendant actually said such a thing but, instead, made an inference from the defendant's testimony that "family's family." A prosecutor may draw reasonable inferences from the evidence, although he or she may not comment upon facts outside the evidence. *State v. McCray*, 267 Kan. 339, 351, 979 P.2d 134 (1999).

The defendant argues that if the statement by the prosecutor was unintentional, jurors are not seasoned legal experts and might have believed he did make the statement that his uncle would cover for him. He argues that either way, such a statement was prejudicial.

It is true the prosecutor's statement was not artfully phrased and should have been avoided. However, it is not possible to say that it was outside the wide latitude given prosecutors to argue the evidence. Further, even if it might be considered misconduct, it was not so prejudicial as to affect the defendant's right to a fair trial. The jury heard the defendant's testimony and cross-examination and was cautioned that the prosecutor's statements were not evidence. Under these circumstances, there was no reversible error.

272 Kan. at 384-385.

Petitioner contends the Kansas Supreme Court erred in not finding the prosecutor's comments to be reversible error based on the "weak evidence" at trial. (Dk. 1, 13). "[A] prosecutor's improper comments will be held to violate the Constitution only if they so infected the trial with unfairness as to make the resulting conviction a denial of due process," and this is the clearly established federal law. *Parker v. Matthews*, ––– U.S. ––––. 132 S.Ct. 2148, 2153 (2012) (internal quotation marks and citations omitted). "[A]bsent infringement of a specific constitutional right, a prosecutor's misconduct may in some instances render a habeas petitioner's trial 'so fundamentally unfair as to deny him due process.'" *Littlejohn v. Trammell*, 704 F.3d 817, 837 (10th Cir. 2013) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974). The

21

court's fundamental unfairness determination involves the following:

> In determining whether a trial is rendered "fundamentally unfair" in light of the conduct of a prosecutor,
>
>> we examine the entire proceeding, "including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase as well as any cautionary steps—such as instructions to the jury—offered by the court to counteract improper remarks."
>
> Wilson [v. Sirmons], 536 F.3d [1064] at 1117 [(10th Cir. 2008)] (quoting Bland [v. Sirmons], 459 F.3d [999] at 1024 [(10th Cir. 2006)]). "[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury . . . will [necessarily] draw that meaning." Donnelly, 416 U.S. at 647; see Banks v. Workman, 692 F.3d 1133, 1148 (10th Cir. 2012) (noting that the fundamental-fairness standard for allegedly improper prosecution statements constitutes "a high hurdle"). "[N]ot every improper or unfair remark made by a prosecutor will amount to a federal constitutional deprivation." Tillman v. Cook, 215 F.3d 1116, 1129 (10th Cir. 2000).

Littlejohn, 704 F.3d at 837-38. "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks and citation omitted). Because the fundamental fairness standard of Darden "is a very general one, leaving courts much leeway in reaching outcomes in case-by-case determinations," a habeas court certainly should pause before setting aside a state court's determination. Parker, 132 S .Ct. at 2155. (internal quotation marks and citation omitted).

The petitioner has not overcome the "high hurdle" of fundamental unfairness for this allegedly improper prosecution closing argument. The court finds the Kansas Supreme Court's understanding and characterization of the

22

challenged closing argument to be reasonable and sound. As understood

within its context, the prosecutor's argument is a reasonable inference drawn

from the defendant's testimony that "family's family." While the argument

certainly could have been phrased more carefully, the prosecutor did not say

he was quoting the defendant and did not tell the jury to base its verdict on any

such statement. The trial court instructed the jury that the arguments of

counsel "are not evidence" and that "they should be disregarded" if "not

supported by evidence." (R. III, 39).   Considering the record as a whole, the

Court finds that the prosecutor's closing statement did not so infect the trial

with unfairness as to deprive the petitioner of due process. Because the state

supreme court's decision is not contrary to, or an unreasonable application of,

clearly-established United States Supreme Court jurisprudence, the petitioner

is not entitled to habeas relief with respect to this claim.

**Failure to Grant Continuance to Investigate Exculpatory Evidence**

The petitioner argues the trial court erred in denying him a

continuance in order to interview Detective W.K. Smith, who was out of town,

on what he might have told family members about the guns involved in the

crime. The Kansas Supreme Court addressed this issue:

> The defendant claims the trial court erred in denying him a
> continuance to investigate allegedly exculpatory evidence. In the middle
> of the trial, the prosecution notified the defendant's counsel that Jimmy
> Spencer, uncle of the victim, had been told by his sister that Detective
> W.K. Smith told Spencer's sister there were three weapons involved in
> the crime; two automatic rifles and a shotgun. Defense counsel wanted

to cross-examine Spencer regarding this statement but the prosecutor objected on the basis of hearsay. Defense counsel stated the statement would not be hearsay because it would not be presented to show that the guns were used, but would be presented to show knowledge of the types of weapons used were available to members of the public. The purpose would be to counteract any argument that the only way Carter could have known what weapons were used in the shooting was if his nephews told him what weapons they used. A long and convoluted argument followed. Eventually, the court determined that the statement was hearsay and because there was no evidence the information was available to Carter, the statement could not be used. The defendant requested a continuance in order to have an opportunity to interview Detective Smith. However, the court found that Detective Smith was out of town and unavailable. Further, because Spencer's sister denied being told by Smith of the guns used, the motion for continuance was denied.

The defendant contends the continuance should have been granted, citing *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In *Giglio*, the United States Supreme Court held that the suppression of material evidence affecting the credibility of a witness justifies a new trial irrespective of the good faith or bad faith of the prosecution. 405 U.S. at 153–54, 92 S.Ct. 763. The defendant contends the information from Spencer was exculpatory and, therefore, it was error for the trial court to deny a continuance to investigate it.

In a criminal case, the granting or denying of a motion for continuance is within the discretion of the trial court. *State v. Stallings*, 262 Kan. 721, 726, 942 P.2d 11 (1997). Prosecutors have a positive duty to disclose exculpatory evidence to the defendant. *State v. Wilkins*, 269 Kan. 39, 42, 5 P.3d 520 (2000). Where the prosecution fails to disclose exculpatory evidence in a timely manner, the proper remedy is to grant a continuance to allow the defendant time to investigate the evidence. *State v. Nuessen*, 23 Kan.App.2d 456, 462, 933 P.2d 155 (1997).

The defendant alleges that the evidence in this case was exculpatory because it rebutted the prosecution's assertion that Carter was telling the truth as he knew what weapons were used and could only have gotten that information from someone associated with the crime such as the defendant. However, the materiality of the evidence is seriously in doubt. The simple fact that a detective might have told a member of the victim's family that certain weapons were used, standing on its own, is insufficient to establish any kind of an inference that the defendant might have been informed of the weapons used. Any investigation by the defendant would necessarily be a fishing expedition

to try to establish a link. Further, contrary to the defendant's assertion, there was never any real argument by the prosecutor that Carter's only source of information could have been his nephews. While the defendant argues that the prosecutor finished his closing argument making that point, a review of the closing argument reveals that this was not the case. Under the circumstances, it cannot be said that the trial court abused its discretion in denying the motion for continuance.

272 Kan. at 385-387.

"The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process . . . ." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). On the one hand, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay" may interfere with a defendant's right to due process. *Id.* This is not a determination subject to any "mechanical tests" on "when a denial of a continuance is so arbitrary as to violate due process," but it depends on "the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Id.* (citations omitted). In the context of a habeas corpus petition, the petitioner must show both an abuse of discretion by the trial court, and that the denial was so "arbitrary and fundamentally unfair that it violates constitutional principles of due process." *Case v. Mondragon*, 887 F.2d 1388, 1396 (10th Cir.1989) (internal quotation marks and citation omitted), *cert. denied*, 494 U.S. 1035 (1990). Thus, a habeas court looks at the "need for a continuance and the prejudice or lack of prejudice resulting from its denial, in the context of a fundamental fairness

evaluation." Id. at 1397.

The petitioner has not shown the Kansas Supreme Court's decision to be contrary to, or an unreasonable application of, federal law. The petitioner has not shown how he was prejudiced by the trial court's refusal to grant a continuance. The petitioner was seeking to investigate the basis of an inadmissible double hearsay statement. The petitioner argued the relevance would be to show that Carter could have gained knowledge about the number of guns from other than his nephews. As the Kansas Supreme Court pointed out, this is not a point that the prosecution made at trial. The petitioner comes forward with no reasonable arguments of prejudice. Moreover, the court cannot conclude that the trial court acted arbitrarily since Spencer's sister denied that the Detective told her about the guns used in the crime. Without any showing of a constitutional violation, the petitioner is not entitled to habeas relief.

**Denial of Right to be Present when Jury's Questions were Answered during Deliberations**

Petitioner argues the denial of due process and a fair trial in that the jury asked eight questions during its deliberations and that on five of them the trial court answered the jury without the defendant being present. Petitioner contends this was plain error and resulted in the trial court giving erroneous answers on questions concerning the entrances to the houses. The Kansas Supreme Court held:

26

The defendant next complains that the trial court failed to follow the proper procedure in responding to questions from the jury. He argues: (1) The trial court improperly communicated with the jury outside his presence, (2) the trial court also improperly answered the questions asked by the jury, and (3) the trial court failed to read back testimony requested by the jury.

K.S.A.2000 Supp. 22–3405, as well as the Sixth Amendment Confrontation Clause and the Fourteenth Amendment Due Process Clause of the United States Constitution, require the defendant's presence at every critical stage of a trial, including whenever the trial court communicates with the jury. *State v. Bell*, 266 Kan. 896, 919–20, 975 P.2d 239 (1999). Similarly, K.S.A. 22–3420(3) requires that once a jury has begun deliberations, any questions concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence, unless the defendant is voluntarily absent. 266 Kan. at 919, 975 P.2d 239.

In the case at hand, the jury asked eight questions of the trial court during deliberations. The record does not reflect the presence of the defendant when five of those questions were answered. The defendant was present for three of the answers. In its decision on the motion for a new trial, the trial court noted the defendant was present for any read-back of testimony but conceded the defendant might not have been present on the other instances such as when the court clarified the jury's question. Where the record does not affirmatively reflect the presence of the defendant, this court will presume that the defendant's constitutional right to be present was violated and that K.S.A. 22–3420(3) was not followed. *State v. Bell*, 266 Kan. at 920, 975 P.2d 239. However, as we recognized in *Bell*, a finding of a constitutional violation does not end the inquiry because a violation of the right to be present is subject to the harmless error rule. 266 Kan. at 920, 975 P.2d 239. Thus, the error will be declared harmless if this court concludes that the error had little, if any, likelihood of having changed the result of the trial. 266 Kan. at 920, 975 P.2d 239.

In order to determine whether the error was harmless, the substance of the responses must be analyzed. It should be noted that the defendant's counsel testified that he actually suggested the answers given. Normally, of course, a litigant is not allowed to lead a trial court into error and then complain of the trial court's action on appeal. *State v. Saleem*, 267 Kan. 100, 109, 977 P.2d 921 (1999). However, the defendant's right to counsel is a personal right to be present and it is possible that his wishes might have been different than that of counsel. Further, the substance of the responses was part of the defendant's

claim that his trial counsel was ineffective. As a result, it is incumbent upon this court to review the responses for prejudice.

The defendant asserts that two of the responses caused him prejudice. One of the questions asked by the jury was:

> "We would like to hear the testimony regarding whose entrance the hooded individual entered in the rear of the house. Carter's & Brian's mother."

After conferring with counsel, the trial court sent the following reply:

> "There was no testimony as to whose entrance the hooded individual entered in the rear of the house."

The jury was obviously concerned as to whether the person seen by Alfred Burdette entered the entrance to the defendant's apartment. The jury's question asked for testimony from Carter and the defendant's mother regarding this subject. The defendant's mother testified: "[T]he back apartment is where Brian was living. The entrances that lead to the main area of the house, but it's completely separate living quarters." Carter testified the defendant's apartment had a separate entrance on the Greeley side, while there was also a side entrance on the other side of the house. Carter also testified that there was no back entrance per se because both the defendant's entrance and the side entrance were on the sides of the house.

The jury then asked a followup question to the trial court's response:

> "There were three entrances described on the house. We need clarification on whose and what doors went to which tenant and where the doors were located. Carter's Testimony."

The trial court answered:

> "There was testimony presented that the door on the front of the house facing 5th Street was to the main portion of the house. There was no testimony presented as to which portion of the house each of the doors entered."

The defendant argued that the trial court's blanket answer did not reflect the complete nature of the testimony at trial. He contends his mother's testimony explained the placement and should have been read. However, the defendant's mother's testimony did not answer the jury's question as to whose entrance at the back of the house the individual was alleged to have entered. In fact, the testimony placed the defendant's residence at the back of the house, which would lead to the inference that it was the defendant's residence the individual entered.

The defendant argues that the court should have read Alfred Burdette's testimony regarding the placement of entrances. However, the jury did not ask for this testimony but, instead, asked only for

28

Carter's testimony.

        Finally, the defendant alleges that the trial court should have read Carter's testimony rather than summarizing it. He argues that under K.S.A. 22–3420(3), the trial court is allowed only to read back or exhibit the evidence, not to summarize it. He alleges that if the testimony had been read, the jury might well have divined the information they were seeking in a manner favorable to him.

        K.S.A. 22–3420(3) does not authorize a trial judge to summarize testimony but, rather, only to read it back if available. However, it is difficult to see how that summary affected the substance of the testimony. At best, the summarized testimony was favorable to the defendant. Under the circumstances, the failure to read back the testimony and the failure to have the defendant present during the communication with the jury did not affect the result of the trial.

272 Kan. at 391-393. Petitioner argues the Kansas Supreme Court misapplied federal law in finding the violation of the constitutional right to be present was harmless error.

        Clearly established federal law recognizes as fundamental rights an accused's "right to personal presence at all critical stages of the trial and the right to counsel." *Rushen v. Spain*, 464 U.S. 114, 117 (1983). Due process also protects a defendant's right to be present "at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). A "communication from the jury . . . was tantamount to a request for further instructions." *Rogers v. United States*, 422 U.S. 35, 39 (1975). Assuming a violation of the Petitioner's right to be present, the harmless-error standard applies and relief is warranted only if such a trial error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*

*Abrahamson*, 507 U.S. 619, 637 (1993).

The Petitioner presents no viable argument for how his presence would have made any difference in how the trial court answered the jury's questions. The Kansas Supreme Court's decision extensively analyzed how the trial court reasonably answered the jury's questions in reference to which witnesses were identified in those questions. The petitioner now attempts to argue prejudice by ignoring the specific witness references in the jury's questions and by suggesting the defendant would have insisted on answers incorporating the testimony of other witnesses. There is nothing of record to suggest that the petitioner's presence and input would have changed the trial court's reasonable approach to answering the jury's questions in specific reference to the cited witnesses. Thus, the petitioner's absence during the trial court's communications with the jury did not affect the result of the trial. The Kansas Supreme Court's determination is not an unreasonable application of federal constitutional law.

**Ineffective Assistance of Trial Counsel**

In his initial petition, Brian Betts did no more than generally argue that his trial counsel had "failed to provide effective assistance" and his counsel's "performance was deficient." (Dk. 1, p. 8). This pleaded claim did not include any allegations of specific instances of ineffective assistance. Instead, the filing only referenced that he had filed a disciplinary complaint against his

30

counsel during trial, that "during the same period of time" his counsel's "license to practice law [was] suspended" due to complaints from other former clients, and that his counsel subsequently admitted he had been suffering from depression during this time period.

In his reply or traverse, counsel for petitioner argues for the first time in this habeas proceeding that the Kansas Supreme Court misapplied federal law in deciding it was reasonable trial strategy not to call witnesses, in weighing trial counsel's performance as a whole instead of analyzing each alleged error, and by labeling counsel's failure to call witnesses in support of his strategy as trial strategy. As this court summarized and cited above, the case law of this circuit is that arguments raised for the first time in a traverse are not properly presented to the district court.

The Kansas Supreme Court on direct appeal took up Betts' claims of ineffective assistance of trial counsel and, in relevant part, held:

> The defendant argues his trial counsel, Mark Sachse, provided ineffective representation. The defendant alleges that his counsel failed to interview and call certain witnesses to confer with him in any reasonable way prior to trial, to make an opening statement, and to file any pretrial motions. Further, the defendant argues Sachse elicited potentially incriminating statements on cross-examination, and failed to properly object to closing arguments or the treatment of jury questions.
> We have held that before counsel's assistance is determined to be so defective as to require reversal of a conviction, a defendant must establish: (1) Counsel's performance was deficient, which means counsel made errors so serious that counsel's performance was less than that guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense, which requires showing counsel's errors were so serious they deprived the defendant of a fair trial. *State v.*

*Sperry*, 267 Kan. 287, 297, 978 P.2d 933 (1999). Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. 267 Kan. at 298, 978 P.2d 933. To show prejudice, the defendant must show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. 267 Kan. at 298, 978 P.2d 933. The performance and prejudice prongs of the ineffective assistance of counsel inquiry are mixed questions of law and fact, requiring de novo review. 267 Kan. at 297, 978 P.2d 933.

The defendant complains that Sachse should have called Della Betts, Lori Betts, Norma Meeks, Clintel Betts, Robert Law, Detective Golubskie, Andrea Burdette, and Dave Thomas to testify on his behalf. The defendant claims Della Betts would have testified that Carter told her he had no knowledge of the murder. However, Sachse explained that Della's testimony would have been undercut by her problems with the legal system and her obvious bias against Carter. The defendant stated at the hearing that Lori Betts would testify Carter told him he was asleep at the time of the shooting and saw nothing. It is difficult to see what this testimony would have accomplished as Carter told the police the same story. The defendant argues that Norma Meeks would have possibly testified that Carter told her he lied to the police. This might possibly have been helpful but there is no testimony as to why this was or was not done.

The defendant in his brief claims Clintel Betts, the defendant's uncle, would have testified he saw the shooters running in a different direction than reported by Alfred Burdette. However, there is no support for that statement in the record, and the defendant made no such claim at his hearing on his motion for ineffective assistance. The defendant did claim Clintel would testify Carter told him Celester and Dwayne were asleep when the shots were fired. This might be somewhat helpful except Carter made the same claim to police at first. Further, Sachse explained that Clintel did not want to testify, thus, reducing his effectiveness as a witness.

The defendant argued that Robert Law would have testified that Spencer had been given information by the police about the crime, and that Spencer had shot at the defendant's house. However, Law's testimony would have been suspect because he was charged with capital murder at the time of trial. In any event, Sachse did not remember ever

32

being told about Law by either the defendant or his family. The defendant also stated that he wanted to call Detective Golubskie to testify as to what was said to Spencer. However, the import of this testimony would have been negligible where the prosecution did not take the position that the only way Carter could have learned about the crime was through his nephews.

The defendant wanted to call Andrea Burdette to testify that her father was drunk and could not have witnessed all that he testified to. If true, however, this testimony would have seriously compromised Sachse's trial strategy which sought to push the blame for the crimes onto Celester and Dwayne.

While the defendant stated he wanted Dave Thomas, his employer, to testify as a character witness and possibly to testify as to the defendant's demeanor the day after the murder, it is difficult to see how this would have added to the defendant's case.

The defendant claimed his trial counsel failed to communicate with him in a meaningful manner and that counsel would not return his telephone calls, answer his letters, tell him the strategy, or prepare him to testify. However, Sachse testified he visited with the defendant on approximately three occasions and also communicated extensively through the defendant's family. Sachse also testified that he made the defendant fully aware of the trial strategy.

The defendant also complained of the failure to make an opening statement. However, Sachse explained that in a case where the witnesses might change their testimony, he preferred not to give an opening statement.

The defendant contended that Sachse failed to file motions in limine or discovery motions. However, he fails to specify what motions should have been filed or what a discovery motion would have accomplished in view of the prosecutor's open file available to Sachse.

The defendant also contends that Sachse elicited incriminating evidence from Carter during his cross-examination at the suppression hearing on Carter's testimony. During cross-examination, Sachse attacked Carter's credibility by questioning his story that Greg was killed because he broke into the defendant's apartment. Sachse stated: "Okay. You're telling us Les told you that the reason Brian killed Greg is because Greg broke into Brian's apartment, right?" Carter replied: "Brian also said that." Sachse then stated: "I understand, but that's the reason you're telling the Court because he broke into this apartment?" Sachse then went on to attack Carter's credibility, highlighting the fact that prior to the murder the defendant was of the opinion that Celester was the person who broke into the apartment. The defendant argues that before

Sachse elicited the information, there was no testimony connecting him to the crime. This is false in that Carter had already testified that the defendant told him he stood over Greg and finished him off. Any argument that Sachse's questioning somehow damaged the defendant is specious.

The defendant also complains that Sachse tried to elicit testimony from Carter at the suppression hearing that Celester and Dwayne's mother thought her sons were involved in the murder. Even if this occurred, it would have been in line with the theory of the defense which was to put the blame on Celester and Dwayne rather than the defendant.

The defendant also argued that his counsel erred in failing to object to his lack of presence when the trial court was communicating to the jury and for failing to object to the substance of the communications. We conclude in this opinion that the defendant's absence when the trial court communicated with the jury was error. However, we also concluded that the error was harmless. Thus, we are confident that counsel's failure was not so serious as to deprive the defendant of a fair trial.

Where experienced attorneys may disagree on the best tactics, deliberate decisions made for strategic reasons may not establish ineffective assistance of counsel. *Crease v. State*, 252 Kan. 326, 338, 845 P.2d 27 (1993). The majority of the defendant's allegations concern Sachse's reasonable trial strategy. Others allegations of error concern disputed facts. Viewing the representation as a whole, we conclude the defendant has failed to overcome the presumption that his trial counsel's performance was effective. As a result, the trial court did not err in failing to order a new trial based on ineffective assistance of counsel.

272 Kan. at 387-391.

To prevail on a claim of ineffective assistance of trial counsel, the petitioner "must show both:   (1) constitutionally deficient performance, by demonstrating that his counsel's conduct was objectively unreasonable; and (2) resulting prejudice, by demonstrating a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding . . . would have been different." *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003) (citing

*Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). On the first prong,

the courts recognize "a strong presumption that counsel's performance falls

within the wide range of professional assistance" and require the defendant to

prove "that counsel's representation was unreasonable under prevailing

professional norms and that the challenged actions was not sound strategy."

*Boyle v. McKune*, 544 F.3d 1132, 1138 (10th Cir. 2008) (internal quotation

marks and citations omitted), *cert. denied*, 129 S. Ct. 1630 (2009). The Tenth

Circuit recently summarized the relevant law governing the first-prong

analysis:

> "[O]ur review of counsel's performance under the first prong of
> Strickland is a 'highly deferential' one." *Id.* [*Byrd v. Workman*, 645 F.3d
> 1159] at 1168 [(10th Cir. 2011)] (quoting *Hooks* [*v. Workman*,] 606
> F.3d [715] at 723 [(10th Cir. 2010)]). "Every effort must be made to
> evaluate the conduct from counsel's perspective at the time. . . ." *United
> States v. Challoner*, 583 F.3d 745, 749 (10th Cir. 2009) (quoting *Dever
> v. Kan. State Penitentiary*, 36 F.3d 1531, 1537 (10th Cir. 1994))
> (internal quotation marks omitted). Furthermore, "counsel is strongly
> presumed to have rendered adequate assistance and made all significant
> decisions in the exercise of reasonable professional judgment." *Byrd*,
> 645 F.3d at 1168 (alteration omitted) (quoting *Dever*, 36 F.3d at 1537)
> (internal quotation marks omitted). Surmounting this "high bar" is not
> an "easy task." *Harrington v. Richter*, ––– U.S. ––––, 131 S.Ct. 770,
> 788, 178 L.Ed.2d 624 (2011) (quoting *Padilla v. Kentucky*, ––– U.S. ––
> ––, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010)) (internal quotation
> marks omitted); *see Fox*, 200 F.3d at 1295 ("[Petitioner] bears a heavy
> burden in that he must overcome the presumption that his counsel's
> actions were sound trial strategy . . . .").
>     A state prisoner in the § 2254 context faces an even greater
> challenge. *Byrd*, 645 F.3d at 1168. "[W]hen assessing a state prisoner's
> ineffective-assistance-of-counsel claims on habeas review, '[w]e defer
> to the state court's determination that counsel's performance was not
> deficient and, further, defer to the attorney's decision in how to best
> represent a client.'" *Id.* (second alteration in original) (quoting *Crawley*

> *v. Dinwiddie*, 584 F.3d 916, 922 (10th Cir. 2009)). As the Supreme Court
> has explained, "because the *Strickland* standard is a general standard, a
> state court has even more latitude to reasonably determine that a
> defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556
> U.S. 111, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009). Thus, our
> review of ineffective-assistance claims in habeas applications under §
> 2254 is "doubly deferential." *Id*. "[T]he question is not whether counsel's
> actions were reasonable. The question is whether there is any
> reasonable argument that counsel satisfied Strickland's deferential
> standard." *Richter*, 131 S.Ct. at 788.

*Hooks v. Workman*, 689 F.3d 1148, 1186-87 (10th Cir. 2012). Our "doubly

deferential" review of this ineffectiveness assistance claim reveals sufficient

reasonable arguments of counsel's performance under *Strickland*. The court

rightly defers to the Kansas Supreme Court's determination that Betts did not

"overcome the presumption that his trial counsel's performance was effective."

272 Kan. at 390-91.

   In the traverse, petitioner's habeas counsel argues that the trial

counsel was ineffective in not calling four witnesses who would have

"discredited" Carter Betts' testimony and in not calling the petitioner's

employer who would testified as a character witness. (Dk. 28, 13-14, 17).

"[T]he decision of which witnesses to call is quintessentially a matter of

strategy." *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008), *cert.*

*denied*, 129 S. Ct. 1630 (2009). For three of the four witnesses, the Kansas

Supreme Court has explained trial counsel's reasons and strategy for not

calling them as witnesses. Based on a review of the entire record, including the

testimony presented at the new trial proceedings, the court concludes that the

36

Kansas Supreme Court reasonably determined the strategy and grounds for the trial counsel's decisions against calling these witnesses were not unreasonable. Nothing argued by the petitioner shows that his trial counsel's decisions are "completely unreasonable not merely wrong, so that [they] bear no relationship to a possible defense strategy." *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir.) (quotation omitted), *cert. denied*, 531 U.S. 938 (2000).

With regard to the witnesses, Norma Meeks and Dave Thomas, the petitioner comes forward with nothing to overcome the strong presumption of reasonableness or to show resulting prejudice. The burden is with the petitioner to "make a specific affirmative showing as to what the missing evidence would have been, but also prove that the witness's testimony would have produced a different result." *Harris v. McKune*, 2010 WL 3270109 at 14 (D. Kan. 2010) (citing *Patel v. United States*, 19 F.3d 1231, 1237 (7th Cir. 1994)). The petitioner's speculation is insufficient "to demonstrate a reasonable probability" of a different outcome. *Id.* (citing *United States v. Boone*, 62 F.3d 323, 327 (10th Cir.), *cert. denied*, 516 U.S. 1014 (1995)). That Meeks' testimony "might possibly have been helpful" is not a finding of reasonable probability. 272 Kan. at 388. As for the testimony of Thomas, the Kansas Supreme Court concluded, "it is difficult to see how this would have added to the defendant's case." 272 Kan. at 389. The court concludes it was not an unreasonable application of clearly established federal for the state

court to determine that the petitioner had not overcome the presumption of effective legal performance and that the petitioner had not shown a reasonable probability of a different outcome. This claim is rejected.

## Constitutional Error in Overruling *Batson* Objection

The initial habeas petition frames the contention as the trial court's error in overruling his objection under *Batson v. Kentucky*, 476 U.S. 79 (1986), to the prosecutor using "his peremptory strikes to remove seven of the eleven African-Americans on the 35 member jury panel and also the only Hispanic juror." (Dk. 1, p. 15). In the traverse, the petitioner's counsel reframes the issue as the Kansas Supreme Court unreasonably applied federal law in deciding the prosecutor's reason for striking "a black juror, Juror Cowan," was not pretextual, when the prosecutor's stated "race-neutral" reason was equally applicable to "juror Laughery, a white woman" but no peremptory strike was used against her.

(Dk. 28, p. 26).

On direct appeal, the Kansas Supreme Court summarized and generally discussed the prosecutor's race-neutral reasons for the challenged peremptory strikes and focused its analysis on Juror Cowan:

> All agree that the defendant set out a prima facie case and the prosecutor articulated race-neutral reasons for the strikes. The defendant argues the trial court erred in finding the prosecutor's race-neutral reasons were not mere pretext for purposeful discrimination. The standard of review to be applied when analyzing a district court's ruling that the State did or did not act with discriminatory

purpose in exercising its peremptory strike is whether the court abused its discretion. [*State v.*] *Harris*, 259 Kan. [689] at 705, 915 P.2d 758 [(1996)]; [*State v.*] *Walston*, 256 Kan. [372] at 373–74, 886 P.2d 349 [(1994)]. Judicial discretion is abused only when exercised in an arbitrary, fanciful, or unreasonable manner, or in other words, when no reasonable person would take the view adopted by the district court. 256 Kan. at 374, 886 P.2d 349.

The defendant contended the prosecutor struck Juror Cowan, a black man, because he was middle-aged and had only been working at his job for 1 year, but failed to strike Juror Laughery, a white woman, who exhibited the same characteristics. The record reveals that Juror Cowan was married with three children, aged 28, 27, and 21, and that he was a janitor for the school district and had been on the job approximately 1 year. Juror Laughery, who was not struck, was divorced, with two children, aged 31 and 21, and was a customer service representative for Montgomery Wards and had been on the job for 1 year. The State argues in its brief that Laughery cannot be compared with Cowan because Laughery was a more attractive juror for the State in that she had someone close to her who had been murdered. The problem with the State's argument was that this distinction was not made at the time of the strike.

We have held that the fact the State strikes a minority juror but fails to strike a white juror with similar characteristics is circumstantial evidence of purposeful discrimination. *State v. Lee*, 263 Kan. 97, 112–13, 948 P.2d 641 (1997). However, while this kind of circumstantial evidence may be sufficient to prove that the State's race-neutral reason was pretextual, it cannot be considered conclusive evidence in each case as a matter of law. The trial court's finding ultimately hinges on the court's evaluation of the prosecutor's credibility, which is entitled to great deference upon appellate review. 263 Kan. at 113, 948 P.2d 641.

This strike is troubling and the trial court made no lengthy analysis of the fact there might have been other white jurors with the same characteristics as the struck juror. On the other hand, the prosecutor in this case did not use his peremptory strikes to remove all African–Americans from the jury panel, although he could have done so. A factor to be considered in determining whether strikes are discriminatory is the presence of other members of the same minority on the jury and the failure of the State to remove such members when given the opportunity. *State v. Kingsley*, 252 Kan. 761, 779, 851 P.2d 370 (1993). The race-neutral reasons given by the prosecutor for the other strikes are facially reasonable.

The United States Supreme Court noted in *Hernandez* that on the often dispositive question of whether the State's strikes were a pretext for discrimination:

> "There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" 500 U.S. at 365, 111 S.Ct. 1859.

> The trial court in the case at hand concluded the prosecutor's race-neutral reasons were valid. This is not a conclusion with which no reasonable person would agree and, therefore, under our standard, we conclude that the trial court did not abuse its discretion.

272 Kan. at 395-97.

The federal habeas court's evaluation of a challenge *Batson*

challenge consists of the following:

> A defendant's Batson challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. 476 U.S., at 96-97, 106 S.Ct. 1712. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. *Id.*, at 97-98, 106 S.Ct. 1712. Although the prosecutor must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices. *Purkett v. Elem*, 514 U.S. 765, 767-768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, supra, at 98, 106 S.Ct. 1712. This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett, supra*, at 768, 115 S.Ct. 1769.

> On direct appeal in federal court, the credibility findings a trial court makes in a Batson inquiry are reviewed for clear error. *Hernandez v. New York*, 500 U.S. 352, 364-366, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion) (holding that evaluation of a prosecutor's

credibility "lies 'peculiarly within a trial judge's province' "). Under AEDPA, however, a federal habeas court must find the state-court conclusion "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Thus, a federal habeas court can only grant Collins' petition if it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge. State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by "clear and convincing evidence." § 2254(e)(1). *See Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S.Ct., at 2325 (2005).

*Rice v. Collins*, 546 U.S. 333, 338-339 (2006).

The initial petition challenges the rejection of the *Batson* objection on the trial record. At trial, the prosecutor explained his strike on Juror Cowan in these terms:

> Mr. Cowan indicated that his job is that he is a janitor for one year. He's for the record appears to be a middle aged man and he's only been working in this job for one year, Judge. I just don't feel he was a stable person.

(R. IV, 123). While arguing the *Batson* objection, defense counsel asked the prosecutor to state again the reason for striking Juror Cowan, and there was this exchange:

> Mr. Cahill: He's a janitor, janitor for one year, and he's a middle aged man who's been working at obviously manager level position for one year.
> Mr. Sachse: Problem with that, Judge, is we don't know, there's no further inquiry into whether he had retired from a position before that. We've got some white males on this panel who aren't working at all who have retire. You can't – by him saying he's a janitor, not making any further inquiry, you can't jump to that conclusion.
> The Court:   The Court's going to find that the State has presented race neutral reasons for the strikes that they have made and the <u>Batson</u> challenge would be denied.

*Id.* at 126. As fully presented, the prosecutor explained that he was concerned over Juror Cowan's stability as he was middle-aged man who had left manager-level positions and now was working as a school janitor for the last year. The defense counsel challenged the assumption in the prosecutor's thinking, but the trial court evaluated the prosecutor's credibility and accepted it. The trial court's credibility determination is reviewed with "great deference" and "sustained unless it is clearly erroneous." *Felkner v. Jackson*, ---U.S.---, 131 S.Ct. 1305, 1307 (2011) (internal quotation marks and citations omitted). There is nothing here to show clear error.

      The AEDPA imposes on federal habeas review "a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 130 S. Ct. at 1862 (internal quotation marks omitted). The Kansas Supreme Court carefully reviewed the record at some length in upholding the trial court's findings. The Kansas Court noted that the prosecutor had not struck a white female juror of similar age who was divorced and had been employed as a customer service representative for less than a year. Federal law recognizes that "[w]henever the prosecutor's explanation for striking a minority juror would also apply to a white juror who was not struck, the explanation loses some credibility." *Black v. Workman*, 682 F.3d 880, 897 (10th Cir. 2012). The Kansas Court likewise discussed how this evidence was not conclusive, and the trial court's finding

was ultimately a credibility determination on the prosecutor. The Kansas Court discussed the prosecutor's other peremptory strikes and the facially reasonable and race-neutral reasons given for them. The petitioner argues the Kansas Court misapplied federal law in looking to these other circumstances, but the petitioner's argument is contradicted by federal law. *See Black v. Workman*, 682 F.3d at 897 n. 4 (discussing *Miller-El v. Dretke*, 545 U.S. 231, 265-66 (2005)). The Kansas Supreme Court's decision is plainly not unreasonable.

**Ineffective Assistance of Appellate Counsel**

The initial petition includes a single paragraph consisting of three sentences that make the conclusory argument that appellate counsel failed "to raise key issues on direct appeal" and failed "to discover and use new evidence" in support of the ineffective assistance of trial counsel issue. This claim is not addressed in the petitioner's traverse.

"This three-sentence argument, which fails to cite, let alone apply, the controlling framework from *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), is so superficially developed that this court deems it waived." *Thomas v. Gibson*, 218 F.3d 1213, 1224 n.9 (10th Cir. 2000). Because there are not offered "even the most basic of details surrounding these" arguments, the court finds no merit in this claim. *Bradford v. Williams*, 479 Fed. Appx. 832, 836, 2012 WL 1573702 at *3 (10th Cir.

2012). Even assuming this claim could be regarded as adequately briefed, the court finds that the Kansas Court of Appeals in deciding the petitioner's § 1507 ineffective assistance of appellate counsel claim applied the correct federal law and did so in a reasonable manner. Petitioner is not entitled to any relief on this claim.

## Error in Withholding Exculpatory Evidence of Spencer's Conviction and Incarceration at Time of Trial

Ground eleven of the initial petition states, "[w]ithholding the exculpatory evidence of Jimmy Spencer's conviction and incarceration at the time of his testifying in the petitioner's trial." (Dk. 16). The petition states this ground without offering a single sentence of argument in support of it. The court concludes this claim has been waived and is otherwise void of merit. Alternatively, the petitioner has procedurally defaulted this claim on the same grounds discussed at pages 15 and 16 above. There is no relief available on this claim.

## Cumulative Trial Error

After making some generalizations about the government's evidence against him, the petitioner argues a denial of due process from the cumulative effect of the errors that the Kansas Supreme Court only found to be harmless. The traverse repeats this argument asking the court to stack the constitutional errors together to determine whether the petitioner was denied a fair trial.

"In the federal habeas context, a cumulative-error analysis aggregates all constitutional errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Lott v. Trammell*, 705 F.3d 1167, 1223 (10th Cir. 2013) (internal quotation marks and citation omitted), *petition for cert. filed*, (Jun. 12, 2013) (No. 12-10798, 12A945). This analysis is triggered "only if there are at least two errors." *Id*. "The cumulative effect of the errors will be deemed harmful if they so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case." *Lockett v. Trammel*, 711 F.3d 1218, 1245 (10th Cir. 2013) (internal quotation marks and citation omitted).

The record does not show that petitioner raised this issue on direct appeal, and the state habeas courts dismissed this issue based on procedural default. This court is procedurally barred from considering this claim because the petitioner has failed to show cause for the default and actual prejudice or that the failure to review his claims would result in a fundamental miscarriage of justice. Alternatively, this issue is inapplicable here because the petitioner has not identified at least two harmless constitutional errors found by the Kansas Supreme Court. The petitioner is entitled to no relief on this claim.

**EVIDENTIARY HEARING**

Because all claims and arguments here have been resolved on the record, there is no need for an evidentiary hearing. *Anderson v. Attorney General of Kansas*, 425 F.3d 853, 859 (10th Cir. 2005). "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). The court denies any request for an evidentiary hearing.

**CERTIFICATE OF APPEALABILITY**

Rule 11 of the Rules Governing Section 2254 Proceedings states that the court must issue or deny a COA when it enters a final order adverse to the applicant. "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court has rejected the constitutional claims on the merits, a petitioner makes that showing by demonstrating that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see United States v. Bedford*, 628 F.3d 1232 (10th Cir. 2010). When a claim is denied on procedural grounds, "the petitioner seeking a COA must show both 'that jurists of reason would find it debatable whether the petition

states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Gonzalez v. Thaler*, --- U.S. ---, 132 S. Ct. 641, 648 (2012) (quoting *Slack*, 529 U.S. at 484). Petitioner has not met these standards as to any issue presented, so no certificate of appealability shall be granted.

IT IS THEREFORE ORDERED that the petition for habeas corpus relief under 28 U.S.C. § 2254 (Dk.1) is denied.

Dated this 2nd day of July, 2013, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge